

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
10/12/2010

| | | |
|---|---|---|
| IN RE: | § | |
| CALTEX HOLDINGS LP | § | CASE NO: 09-31875 |
| | § | Jointly Administered Order |
| Debtor(s) | § | |
| | § | CHAPTER  7 |

### MEMORANDUM AND ORDER GRANTING FEE APPLICATION
### (DOC # 551)

This memorandum and order adjudicates a dispute over whether administrative claims of a chapter 11 Trustee can be paid ahead of other chapter 11 administrative claims.  Clearly, the answer to that question, under almost all circumstances, is "no."  However, for reasons set forth below, the Court concludes that there are extraordinary circumstances in this case that justify exercise of the Court's equitable authority (including but not limited to Bankruptcy Code § 105(a)) and the Court's authority under Bankruptcy Code § 506(c).  Therefore, the motion for allowance of an administrative expense for counsel for the Chapter 11 Trustee is granted and the Trustee is authorized to pay the expense according to the terms of the cash collateral order.

### SUMMARY

Debtor filed a voluntary petition commencing this case on March 20, 2009.  Because of schedule conflicts, two different bankruptcy judges heard the initial motions.  The two judges independently reached virtually identical conclusions on one of the most important initial requests: the engagement of independent contractors to conduct Debtor's operations and to conduct the bankruptcy case.  The judges concluded that the independent contractors were related to or were affiliated with the entity that proposed to acquire Debtor's assets and that their relationship created conflicts of interest.  The judges therefore, in two separate hearings, independently denied the request to use Debtor's assets to pay these independent contractors at Debtor's expense.  With respect to the other motion filed at the commencement of the case, Judge Isgur concluded that Debtor had provided inadequate justification for emergency consideration of Debtor's requests to sell $20 million of scrap metal and alleged surplus assets on an emergency basis with reduced notice.  The proposed purchaser then withdrew its proposal, and Debtor limped along with more modest sales of scrap metal and alleged surplus.

After four months operation as a debtor in possession, all of Debtor's management resigned on the eve of a hearing on the secured lender's motion to convert the case to chapter 7.  Debtor moved for (and insisted on) appointment of a chapter 11 trustee in lieu of conversion, asserting that an independent trustee could dissipate some of the enmity between Debtor and its creditors and could confirm a plan.  The Court granted the motion to appoint a trustee and denied the motion to convert.  After two months, the Trustee reported that Debtor's expansive and imaginative contentions regarding the value of Debtor's assets and regarding the potential for reorganization were unsubstantiated.  The Court therefore converted the case to chapter 7.

There are two major accomplishments in the case, to date. First, the value of Debtor's assets and Debtor's potential for reorganization has been thoroughly examined through a realistic lens with appropriate notice and an opportunity to be heard. Second, Debtor's assets and the general public have been protected from environmental and other safety hazards by agreement with the senior secured lender for use of cash collateral. The Trustee and his counsel are due principal credit for these accomplishments, although Mr. Mihm (one of the proposed contract employees who also had a conflict of interests) deserves significant credit for some of the latter accomplishment. The secured lender, who now appears to be undersecured, has consented to the use of its cash collateral to pay the Trustee and Trustee's counsel, but not to pay Debtor's counsel. There has been no request for allowance of an administrative expense to compensate Mr. Mihm.

This memorandum concludes that under these extraordinary circumstances (as more fully detailed below) Trustee's counsel can be paid out of cash collateral even when Debtor's counsel is not.

## FACTS

A.   Proposed $20 Million Emergency Sale of Scrap Metal

On the same day that Debtor filed the voluntary bankruptcy petition that commenced this bankruptcy case, Debtor filed an emergency motion to sell $20 million of scrap metal to raise cash for operations. The motion alleged that Debtor's assets exceeded $60 million.[1] The motion represents that the liens against the collateral were principally a loan from Newstar Financial for about $21 million.[2]

Creditors filed objections to the motion to sell scrap metal. To accommodate both the alleged emergency and conflicting judicial schedules, Judge Isgur agreed to hear the motion for Judge Steen. After hearing, Judge Isgur concluded that there was no emergency that justified such substantial relief on such short notice. In addition he concluded that "The deal has hair on it."[3] In essence, he held that Debtor had asked for too much, too early, with too little notice.

---

[1] Docket # 2, paragraph 6. Real Estate = $35.3 million, Equipment = $11.2 million, scrap = $14.3 million. The motion does not disclose that the property was environmentally damaged, unsafe, and "looked like an atom bomb hit it." That information was not provided until May 28 by Mr. Mimh, Debtor's "boots on the ground." *See below*.

[2] The motion refers to a loan from Paseo Partners LLC (incorrectly referred to in the motion as Paseo Group, LLC) and recognizes that the Paseo loan was converted to equity prior to the filing of the bankruptcy petition. The motion does not refer to approximately $10 million in other allegedly secured loans (Eagle Environmental, Inc, Grant Mackay Company, Harris County, MMR Constructors, Smith Construction Services, Harris County WCID, and San Jacinto Community College) that were later disclosed in the bankruptcy schedules. All liens were listed as disputed. Some arguably did not attach to personalty, but arguably did.

[3] Transcript, March 26, 2009 hearing page 8, line 23. It was an interesting turn of phrase, considering that Mr. Jarnigan, Debtor's GP's President used the same phrase to describe earlier contracts that Debtor's prior management had negotiated.

It is important to note that Judge Isgur did not rule that the scrap could not be sold under the proposed contract. He simply ruled that disposition of the motion required adequate notice, opportunity to respond, and a hearing. Debtor subsequently withdrew the motion.

Debtor then filed a motion to sell about $200,000 of scrap metal. Again, because of scheduling problems, Judge Isgur conducted the hearing for Judge Steen. Judge Isgur authorized the $200,000 sale and authorized the payment of most of the operating expenses that Debtor proposed to pay.

B.  Proposed Payment Of Professionals Engaged to Conduct the Case

One of the operating expenses that Debtor proposed to pay from the $200,000 was a reimbursement to Debtor's general partner, CalTex Holdings GP, Inc. (GP) for contract professional services of WK Management Services ("WK"), an affiliate of GP.[4] The proposed arrangement between Debtor and WK Management Services was, in this Court's experience and in Judge Isgur's experience, unique. Judge Isgur heard an abbreviated explanation of the relationship, and concluded that based on his limited understanding (on emergency hearing) the relationship was not appropriate. Judge Isgur was troubled by the fact that the individuals managing Debtor seemed to have a conflict of interest because they had no relationship to Debtor prior to the filing of the bankruptcy petition, were introduced to Debtor by GP whose affiliates intended to purchase Debtor, and the proposed contract employees intended to become part of GP's affiliated group of companies. Judge Isgur was also concerned because Debtor apparently had no intention to vet these *de facto* restructure professionals through the process prescribed by Bankruptcy Code § 327.

Judge Isgur found that the individuals engaged were "professionals" (and consequently WK was a "professional") within the meaning of Bankruptcy Code § 327. Therefore, WK could not be engaged without court approval and without their compensation being subject to court approval. Second, Judge Isgur concluded that the professionals at WK were not disinterested. He concluded that some of them, and potentially all of them, had personal interests potentially adverse to the estate.

Judge Isgur stated:

> And so the request is that we hire professionals to work for the estate, whose long-term goal was to help somebody else and who have a financial incentive in the other entity that they're hiring. Those are not people that I'm going to authorize to work in the estate. Now, it may be that all this can be juggled around and something else can be done, but we don't pay professionals to work for purchasers out of assets of the estate outside of a plan. I think that we're so far afield of what we need to be doing here that -- I don't think this is a close call. I am denying it with prejudice. Unless the circumstances change, they may not be paid out of the estate.

---

[4] WK was an affiliate of GP because the president of GP owned WK.

Page 3 of 15

Judge Isgur left open the issue of whether the relationship could be restructured in a way that would make it acceptable. Debtor asked for, and Judge Steen gave Debtor, a new hearing on reconsideration of whether WK could provide Debtor's management at Debtor's expense.

To establish the issues for hearing on reconsideration, Debtor filed an Application to Employ Contractors as Management.[5] The Application states that WK was a single purpose entity formed solely to engage professionals to advise GP regarding Debtor's management; the advice and services would include strategy and business decisions governing the conduct of the bankruptcy case. WK was to provide management services to Debtor's GP which in turn would manage Debtor.

Judge Steen conducted the hearing on that Application. The transcript of that hearing is found at docket # 211. At the conclusion of the hearing, the application was denied for reasons set forth orally at some length beginning on page 165 at line 15. In summary, the Application was denied because:

- The structure of the relationship was suspicious because it was unreasonably complex, without any explanation of why it was so complex;
- The functions usually performed by individuals with duties directly to the Debtor (*i.e.* corporate or LP management) were to be performed by an independent contractor, a special purpose entity created for that sole purpose by the President of the GP; the limited purpose entity had no assets that would not be responsive to any claim for damages in case of breach of its obligations;
- The management team charged with responsibility to produce a chapter 11 plan for the benefit of all creditors and for the estate were hired by, and could be terminated at will by, the person who was trying to acquire the property of the estate;
- The management team, through complex mergers, would acquire an interest in the reorganized Debtor; prior to engagement by WK, these professionals had no relationship to Debtor, but would acquire an interest in an undetermined amount, after consummation of a chapter 11 bankruptcy plan and then through merger of entities unrelated to Debtor;
- The management contracts for the professionals, although lengthy and detailed, were mere boilerplate; they clearly did not set forth the entire agreement with the professionals; bonus contingencies were not clear; the contractual duties of Chief Administrative Officer, Chief Financial Officer, Vice President, and Chief Operating Officer and the office manager were exactly the same;

---

[5] Docket # 169. The motion is docketed as "Application to Employ Contractors as Management" but the title of the motion is actually "Debtor's Application for Reimbursement of Management-Related Personnel Retained Through Caltex Holdings GP, Inc. for the Benefit of Debtor."

C.  Debtor's Contentions About Assets and Business Prospects—Illusory From the Beginning

Debtor has consistently represented that its assets exceed $64 million and that its debts are less than $32 million.[6] Debtor represented that Debtor's land, the former Champion Paper Mill operations in Houston, had " … all the elements of a small city, given the infrastructure, the roads, the electric lines the wastewater treatment facilities, permitted landfills, railway spurs, *et cetera.*"[7]

Much of Debtor's equity is owned by Paseo Partners, LLC. Dr. Waldvogel, the President of Paseo, testified that Paseo consisted of over 100 naïve investors who had been defrauded by Dennis Keating.[8] Paseo had lent money to Debtor and in 2008 Paseo converted that claim to equity. Dr. Waldvogel was elected to the board of directors of GP with other Paseo investors when Keating's proposals failed to materialize. GP determined to sell Debtor's assets and made an unsuccessful effort to do so. Then GP engaged Scott Jarnigan. Mr. Jarnigan made a powerpoint presentation to GP that proposed various sales of some of the property but Mr. Jarnigan wanted some of the property for an initiative of his own to turn the environmentally challenged paper mill site into a green energy showpiece.[9] GP reached an agreement with Jarnigan:

> Well the agreement essentially was that he would do his -- his best and put together a management team that had some experience and background who actually could get out there and perform, and do the job with the property, and that they felt that through, you know, once they got things up and running, that eventually the best way to get anything back to us once it's happened, would be probably through stock in SEP, perhaps maybe, you know, something else could be worked out along that line, too, but stock was the main issue from getting any return 9 back to Paseo partners.[10]

To commence Mr. Jarnigan's plan, GP's board of directors was reconstituted with Jarnigan and 3 of his team replacing 4 of the 5 Paseo members of the board of GP. GP engaged WK to provide management. WK was owned by Messrs. Jarnigan and Hada. WK, which owned no interest in Debtor and held no claim pre-petition against Debtor, hired independent contractors to provide the management. At the end of the day, Mr. Jarnigan or his affiliated companies would take a majority equity position in Debtor under the plan of reorganization.[11]

The most impressive member of the management team that Mr. Jarnigan recruited was Mr. Mihm, who described himself as the "boots on the ground" person attending to a number of

---

[6] *See* Debtor's initial pleadings and schedules and statement of financial affairs.
[7] Transcript of May 28, hearing, docket # 211, page 3 lines 17 through 21 (hereinafter "Transcript").
[8] Transcript, beginning about page 14.
[9] Transcript, page 36 line 24 through page 37 line 1.
[10] Transcript, page 38 line 25 through page 39 line 9.
[11] Transcript page 81, lines 12 through 18.S

environmental and safety issues at the property. Mr. Mihm testified about his first visit to the abandoned paper mill site:

> When we came on April Fool's Day, which turned out to be very appropriate day, visited that site. It looked like an atom bomb had gone off. And the first thing we did was to investigate the site to see if it was safe to enter. It wasn't. So we had to dismiss all people on site. Went to OSHA to ask for help. They told me that OSHA can't -- could not help me because of a prior event that happened on -- under the tenure of the previous management. And until that investigation was complete, I couldn't get the help I needed. …Power had all been cut, so the site was unsafe. The site was deteriorating rapidly.[12]

In a number of hearings and in the work that he reportedly did as the "boots on the ground", Mr. Mihm demonstrated his concern and engineering competence..

Mr. Mihm exudes credibility and inspires confidence. Mr. Jarnigan, President of GP and the leader of the rescue effort put together by Paseo, is a different matter altogether. He testified that he was the founder, Chairman, and part owner of Sustainable Energy Properties (SEP) and president of WK Management. Mr. Jarnigan testified that he had interests in waste energy, solar, zero carbon technologies, bio-diesel plantation group in the United Kingdom, DI Oils, proton power, plug and play boiler system, coal mine methane extraction, China Goldmines, electric bus assembly and manufacture, algae to oil technology, green construction, and that he was looking at other opportunities as they came along.[13]

Mr. Jarnigan testified that SEP

> … was set up to develop real estate into sustainable energy parks through the United States, South American, and the European Union. We currently are in the process of projects in the state of Mississippi, Jamaica, Mexico, Houston, as our hope for Houston, as well as three projects through an alliance with a group in China for three 200 acre sustainable energy villages in China.
>
> We're also involved, Chuck Carl is also the Chairman of Atlantian (phonetic), which is a group that's set up by the United Nations, and private groups such as Bill Gates, Cochela (phonetic) Ventures, et cetera, to develop sustainable energy parks in villages in the islands where climate change affects -- climate changes occurs the most -- problems with climate change.[14]

---

[12] Transcript page 89 lines 8-22.
[13] Transcript pages 115-116..
[14] Transcript page 97 lines 10 through 16.

Mr. Jarnigan testified that the proposed WK professionals did not then own part of SEP, but that SEP would go public on the Toronto stock market and the employees of WK would become owners of SEP by virtue of SEP's acquisition of HNNG Development.[15]

Mr. Jarnigan testified that he was working 70 hours per week on Debtor's business, without compensation, for two reasons: (i) because the Paseo investors had lost money and he wanted to help them out,[16] and (ii) because he wanted SEP to create a renewable fuels park out of the former paper mill. He testified that he first learned of the property in June, 2007, through a conversation with his insurance agent who introduced him to the "CalTex person". They flew to New York, met with AIG, and agreed to acquire and to develop the facility through a new entity that they would create, Global Green Resources LLC. But that deal never got off the ground. "We went to the closing and no one showed up."[17]

Mr. Jarnigan's next contact with the project was December, 2008. Mr. Jarnigan testified that he was contacted by Newstar's representative who asked if Mr. Jarnigan was still interested in purchasing the property. The board of GP had changed, so Mr. Jarnigan made the same slide show presentation to them that he had made in 2007, but required "that they be in the deal with us…like all deals that we're involved in…we want everybody to be a partner in the deal."[18] Mr. Jarnigan vaguely described the business plan as forming a new company to acquire the old paper mill site, having Paseo and Mr. Jarnigan's firm own the new company,[19] and then Paseo converting its shares of the acquisition company into shares of SEP.

> And everyone seemed to think there was something—we were trying to pull some shenanigan.[20]

But that proposal also never got off the ground.

In February, 2009, another proposal was put together. In an agreement with the "Paseo board"[21] it was decided

> "…that I would bring in a group of guys with experience who could help and assist in saving this asset for Paseo Partners, LLC.

Mr. Jarnigan and three associates were elected to the Board of GP. Mr. Jarnigan and his associates Paul Cox and Carl Watkins set up "an acquisition called Houston Sustainable Energy Park" to acquire the interest in Debtor "where Paseo would own an equity stake in it where they

---

[15] On cross-examination, Mr. Jarnigan was not sure which members of the MK management team would get stock in SEP (and therefore indirectly in the reorganized debtor) and which ones would not. Transcript page 119 line 13 through page 121 line 18.

[16] On cross examination he explained that his motives were purely charitable and philanthropic on this objective.

[17] Transcript page 101, line 13.

[18] Transcript, page 103, line s 6-9.

[19] PGL.

[20] Transcript, page 105, lines 3-5.

[21] The Transcript at page 106 lines 1 through 13 indicates that Mr. Jarnigan had some confusion about which board he met with.

could convert it to SEP shares."[22] That, plus the money that Debtor asked to pay them as the WK management team, was the compensation that they would receive for their work. One of the WK management team members was Mr. Jarnigan's son, a college student intern, to receive $6,000 base plus a performance bonus of $5,000 per month if a plan was confirmed. Most, but not all, of the WK professionals would get stock in SEP, which would in turn own the reorganized debtor.

       D.       Mr. Jarnigan's Three Attempts to Acquire Debtor's Property

Mr. Jarnigan's testimony, as summarized above, is that he had made three attempts to acquire Debtor's property before the filing of this bankruptcy case:

    1.    The 2007 offer to purchase when "We went to the closing and no one showed up."
    2.    The 2008 proposal that never got off the ground.
    3.    The February, 2009, proposal that morphed into the Debtor's plan.

Debtor's disclosure statement was filed May 26. On May 28, 2009, Debtor represented that it had a plan in place and could confirm that plan within a few months.[23] Another of Mr. Jarnigan's entities was central to feasibility.

The centerpiece of that business plan was the creation of the Houston Sustainable Energy Park " …which was expected to include several of the following potential sustainable energy project developments:"
- Waste to Energy Facility
- Bio Fuel, Bio Crude Oil Storage Facility
- Green Residential Construction
- Green Commercial and Industrial Construction
- Biomass Power Plant
- Algae Oil Production Facility
- Concentrating Solar Power Facility

This is essentially the same business plan that failed in 2007 and 2008. A hearing on the disclosure statement was set for July 7. Creditor Newstar filed a motion to convert from chapter 11 to chapter 7. Debtor filed a motion to appoint a chapter 11 trustee. These and other motions were also set for hearing July 7, 2009.

At the July 7 hearing, Debtor announced that it could not proceed with the plan or with other matters related to engagement of professionals. All officers and directors had resigned and the proposal for development of the property had been withdrawn and no development plan was in prospect.

       E.       Appointment of A Chapter 11 Trustee

---

[22] Transcript page 111 line 10 through page 114 line 6.
[23] Transcript, page 8, lines 13-14.

Debtor consented to appointment of a chapter 11 Trustee, but opposed conversion to chapter 7.

The Court held an extended hearing. The most credible and influential witness was Mr. Mihm, the former on-site manager of the project. Mr. Mihm reiterated evidence previously heard by the Court concerning the serious environmental hazard(s) found on the property and the required interaction with the EPA and TCEQ, the fact that a work-related fatality had occurred on the property and the required interaction with OSHA, that law and regulation required the engagement of a licensed waste water operator on the property, a licensed electrician on the property, and an environmental consultant.

Notwithstanding Mr. Mihm's testimony, twice, that the property was critically (if not fatally) damaged, Debtor's counsel vigorously argued that the property was valuable enough to pay all creditors in full and leave additional funds for equity interest owners. Counsel argued that to realize that value, an independent chapter 11 trustee should be appointed. Debtor's counsel clearly implied that Newstar and other creditors were to blame for Debtor's difficulty in prosecuting the case. He argued that the suspicions and allegations against Debtor's management could be resolved by an independent chapter 11 trustee. A number of other parties in interest supported that result, but for different reasons. They argued that even though Debtor had been operating as a debtor in possession for 4 months, they did not have enough information to evaluate the business potential and needed an evaluation by an independent third party.

After extended hearing and over objection by Newstar the Court accepted Debtor's counsel argument for appointment of a chapter 11 trustee, rather than immediate conversion to chapter 7.

F.  The Independent Trustee's Conclusions And the Second Motion to Convert

The Chapter 7 Trustee served for three months. Then he filed a motion to convert the case to chapter 7. The Trustee stated:

> 4. … Since the debtor's purchase of the Real Property in December, 2006, the improvements to the Real Property have significantly deteriorated. Several buildings have been demolished and others may no longer have sufficient structural integrity to serve any commercial purpose. The Real Property is impacted by significant environmental issues—the full extent of which is not yet known.
>
> 5. By Order entered July 7, 2009, the Court appointed the Trustee [Docket No. 288]. Since his appointment, the Trustee has conducted an investigation of the Debtor's financial affairs and the prior representations to this Court. The Trustee has determined that (i) the prior representations regarding the estate's assets were grossly overstated; (ii) the Debtor has no reasonable likelihood of reorganizing; and (iii) the Debtor does not have the ability to propose and consummate a plan…

> …7. The Debtor does not have sufficient operations or capital to meet ongoing expenses. With the administrative costs incurred to date, the Debtor cannot propose a confirmable plan. Even if a plan could be confirmed, no benefit is realized from a liquidating chapter 11 plan versus a chapter 7 under the circumstances present in this case.

Only one objection was filed; an objection jointly filed by Debtor and by Debtor's counsel.[24] The objection argues (i) that the chapter 7 Trustee was primarily attempting to prime chapter 11 administrative expenses with chapter 7 administrative expenses, (ii) that Grant Mackay Company was willing to propose a plan of reorganization; and (iii) that the Trustee had not filed a report of his investigation as required by law. The objection also implies that the Trustee was improperly motivated by an allegiance to Newstar Financial.

The Court held a hearing on November 16, 2009. Debtor's counsel speculated that "any number of plans" could be confirmed. But the chapter 11 Trustee testified that the maximum recoverable value from scrap would be between $3.1 and 1 and $4.2 million, some of which had already been sold and spent pursuant to cash collateral orders. The Trustee estimated that the maximum recoverable value from the sale of the equipment would be between $4 and $6 million. The Trustee estimated that the maximum recoverable value from the land was $5 to $10 million, or less, depending on remediation costs. The Trustee described unremediated environmental issues including, without limitation, asbestos contamination. The Trustee estimated chapter 11 administrative expenses at approximately $1 million. The Trustee testified that he was entirely dependent on consent by secured creditors to address environmental and safety issues because the value of the assets was less than the liens and administrative costs. The Trustee testified that the Grant Mackay Company had not made any proposal for a chapter 11 plan. Although the Grant Mackay Company had mentioned a prospective purchaser, that prospect had not materialized. The Grant Mackay Company was present in Court through counsel, but did not contradict or cross-examine the Trustee on that matter.

Debtor's counsel offered no witnesses or evidence other than extensive cross-examination of the Trustee. Debtor's counsel was driving to prove that appraisals that preceded the filing of the bankruptcy case showed the property to have substantial value and to assert that the first motion filed in the case (which had been withdrawn) showed that the scrap metal could be sold for $20 million. The Trustee testified concerning his reasons for discounting the appraisals and the scrap metal value.

The Court, for reasons stated on the record, converted the case to chapter 7.

G. The Fee Application At Issue

On August 9, 2010, Counsel for the chapter 11 Trustee filed its first and final application for compensation, asking for $73,995.00 in fees and $2,289.67 in expenses. The application asks for payment of the fees from amounts for which Newstar Financial has consented to the use of its cash collateral.

---

[24] Debtor's counsel joined the objection as an administrative claimant.

Counsel for Debtor objected.  First, the objection argues that over $600,000 in administrative expenses have already been awarded, of which about $400,000 were awarded to Debtor's counsel.  Those administrative expenses have not been paid because the estate is administratively insolvent.  Debtor's counsel objected to payment of the chapter 11 Trustee's counsel fees out of cash collateral unless Debtor's counsels' fees are also paid, at least paid *pari passu.*.

Second, Debtor's counsel objected to the form of, and detail in, the fee application.  Specifically, they objected to "lumping," that is the grouping of multiple tasks on a time sheet on a single date without any indication of how much time was spent on each task.

## CONCLUSIONS OF LAW

A. Payment of Administrative Claims *Pari Passu*

1. Generally

The argument is really very simply stated.  Trustee's counsel argues that all property of the estate is fully encumbered and there is no money to pay administrative expenses other than such money as the secured lender consents to be used for that purpose.  Mr. Stroube argues that an administrative expense is an administrative expense, and that secured creditors do not have the right to designate which administrative expenses get paid and which ones do not.

The Court has read the legal authorities that Mr. Stroube cites in his memorandum of authorities and, as a general legal proposition, the Court agrees.  Absent truly extraordinary circumstances determined on uncontroverted or clear and convincing evidence, secured creditors cannot be allowed to determine which administrative expenses get paid and which ones do not.  And the Court agrees with Mr. Stroube that this rule applies, even if all property of the estate is fully encumbered.

2. Truly Extraordinary Circumstances Involving Public Health and Safety

Ordinarily, a bankruptcy trustee would abandon fully encumbered property and there would be no material administrative expenses.  That did not happen in this case because Mr. Stroube filed a petition and multiple pleadings in this Court and regularly advocated the position that Debtor's assets substantially exceeded its debts.  Notwithstanding alleged appraisals supporting that view, the estate has now been administered for almost 18 months and no one has offered anything like the values that Mr. Stroube represented to the Court.  True enough, Mr. Stroube was in control only for the first 4 months, but the plan that he proposed was so insubstantial that it was withdrawn prior to hearing.  Even with a chapter 11 or a chapter 7 Trustee in place, Mr. Stroube or anyone else could have brought a buyer to the table, but no one did.  In summary, this case was in chapter 11 for 7 months; Debtor proposed one plan and then withdrew it as unconfirmable at the hearing on the disclosure statement.

In the 11 months after the case was converted to chapter 7, no one has offered to purchase any assets at anything approaching the values advocated by Debtor. If a sale at those amounts were possible, one would expect the Trustee to propose a sale. Not only does a Trustee have a duty to maximize value, it is in the Trustee's best interests to obtain maximum value. A trustee's compensation increases with the additional value that he is able to find.

Ordinarily, a trustee can evaluate extravagant valuation claims and abandon assets that have no value for unsecured creditors. And ordinarily the trustee can do that without incurring substantial administrative expense. Therefore, a debtor's mere puffing about asset values or fantasies about plan possibilities would not justify allowing a secured lender to determine which administrative claims were paid and which ones were not.

But not only were the assets that Debtor and counsel brought to this Court unreasonably valued, and not only did Debtor's counsel demand appointment of a chapter 11 trustee (arguing that an independent trustee could allegedly obtain full value) the assets that Debtor brought to this Court were plagued with environmental and public safety liabilities that required constant expenditures to maintain value and to protect employees and the public. Obtaining the funds to do that required sound work by the chapter 11 Trustee (and by Trustee's counsel). Newstar Financial stepped up to the plate and consented to the use of its cash collateral for those purposes, and for the payment of <u>some</u> administrative expenses, administrative expenses that would actually preserve and protect the public and would move the case to conclusion. Newstar did not consent to payment of administrative expenses for advocacy of a position that merely sought delay in the hope that a miracle would produce value for equity.

Allowing that limited consent by a secured creditor is different from allowing a secured creditor to dictate which administrative expenses get paid and which ones do not.

### 3. Section 506(c)

The Court has authority under Bankruptcy Code § 506(c), even without consent of a secured lender, to surcharge collateral to pay a trustee for services benefitting that collateral. *A fortiori* the Court has authority to permit such a surcharge with the consent of the lender.

Mr. Stroube argues that the cash collateral order did not recite § 506(c) when it carved out funds from cash collateral for the Trustee and his professionals. That is true, but the Court sees no requirement for contemporaneous citation to § 506(c). But if such a reference were necessary, the Court would so amend the cash collateral orders.

      4.      Section 105(a)

The Court recognizes that Bankruptcy Code § 105(a) is not "a roving commission to do equity."[25] But it does give the Court the authority to issue such orders as are necessary to effect the provisions of Title 11.

The Court is absolutely convinced that Newstar would not consent to payment of $400,000 of Debtor's counsel's legal fees from its cash collateral. The Court can see no basis in § 506(c) to surcharge Newstar's collateral for Mr. Stroube's of Ms. Venus' services.

As a matter of public policy, exercise of the Court's § 105(a) authority under these circumstances is necessary to assure that competent trustees and counsel will undertake the thankless work of protecting employees and the public by cleaning up a fully encumbered mess that has been deposited in the bankruptcy court.

      5.      Clean Hands

Newstar moved for immediate conversion to chapter 11 in June, 2009. Debtor's counsel vigorously objected, asserting that a neutral trustee should be appointed instead and that the case should continue in chapter 11 because any number of plans could be proposed. A neutral professional was appointed, and now Debtor's counsel asserts that those professionals should not be paid unless he is paid as well.[26]

The Court questions whether the valuations and motions filed by Debtor's counsel at the commencement of this case were based on sufficient due diligence to pass the Rule 9011 scrutiny. Be that as it may, the subsequent argument at the first hearing on conversion or appointment of a chapter 11 Trustee on reflection seem disingenuous. That conclusion is supported by the fact that Debtor's counsel assured the Court on May 28 that a plan was in prospect, and despite inspired argument at the hearing concerning great asset value and alternative plans that would be possible, no one offered any proposals or brought forward any potential buyers during the chapter 11 Trustee's administration and no one has brought forward any potential buyers since the chapter 7 conversion.

No other party has objected to payment of the Trustee's professionals from Newstar's cash collateral. Debtor's counsel does not have clean hands. The Court rejects his argument.

      6.      Law of the Case

---

[25] *See U.S. v. Sutton*, 786 F.2d 1305, 1307-1308 (5th Cir. 1986) ( "While the bankruptcy courts have fashioned relief under Section 105(a) in a variety of situations, the powers granted by that statute may be exercised only in a manner consistent with the provisions of the Bankruptcy Code. That statute does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.")

[26] Nominally, Mr. Stroube argues that the professionals should be paid, but only if he is paid proportionally. Since there is no money to pay chapter 11 administrative expenses, the argument really is that the chapter 11 trustee's professionals should not be paid. No matter what the proportions are, if the principal to be divided is zero, the proportions are zero.

Multiple cash collateral orders have been issued in this case, all providing for payment of the professionals fees and expenses out of cash collateral. That process is the law of the case.

B. "Lumping"

The Court agrees with Debtor's counsel that the amount of detail in the fee application does not meet required standards. On some days, timekeepers recorded a large amount of time without indicating the amount allocated to each separate tasks. Because that allocation is not available, in a few instances the Court cannot determine whether the time allocated to a specific task was excessive.

But as the evidence at the hearing showed, on many days the timekeeper only worked on one task, or it was possible from the testimony to determine how the time in the "lumped" entry was allocated.

In addition, the testimony showed that counsel was fastidious about not double billing, *i.e.* not billing more than one attorney when the services of only one sufficed. Testimony at the hearing established careful limiting of time charges.

After review of the time entries, the Court concludes that a $7,400 reduction in fees is appropriate both to eliminate "lumped" time and to make the point for future fee applications.

C. Other Standards for Allowance of Attorney Fees

Bankruptcy Code § 330(a)(3) establishes the standards that the Court must consider when allowing fees.

1. Nature and Extent of the Services

In essence, counsel assisted the Trustee to examine Debtor's assets and claims, to examine the claims against Debtor, and to evaluate the prospects for a viable reorganization. These services require a great deal of expertise and experience.

2. Time Spent

Trustee's counsel's fee application sets forth the hours worked and the tasks performed. The Court is impressed with the fact that multiple attorneys did not all bill for time that they spent jointly inspecting property, interviewing witnesses, *etc.* The number of hours allocated to given tasks (with the limitation noted above) were well within the range of this Court's experience.

3. Rates Charged

Counsel are some of the most experienced and able that the Court sees. Their hourly rates are lower than rates of several comparable counsel.

        4.        Whether the services were necessary

No one has questioned the necessity of the services. Debtor's counsel explicitly sought those services. So did all other creditors. The services were beneficial to the estate in achieving the two accomplishments of the case to date, as set forth more fully above.

        5.        Whether the time charged to tasks is reasonable

*See* #2 above.

        6.        Counsel's skill and experience

Counsel are some of the most experienced and able that the Court sees.

        7.        Whether the fee is reasonable

The Court reviews dozens of fee applications each month. Considering the task and the accomplishments, these fees are reasonable.

## CONCLUSION

For these reasons, it is ordered that Porter & Hedges L.L.P. is awarded professional fees of $66,595 in professional fees and $2,289.67 in expenses to be paid as provided in the cash collateral orders in this case.

SIGNED 10/08/2010.

_____
Wesley W. Steen
United States Bankruptcy Judge